**Opinion issued December 10, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00701-CV
_____

**ELIZABETH MAGRO, Appellant**

**V.**

**ALEJANDRO MAGRO, Appellee**

---

**On Appeal from the 246th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-45960**

---

## MEMORANDUM OPINION

Appellant, Elizabeth Magro ("Elizabeth"), challenges the trial court's final divorce decree, entered after a bench trial, in her suit for divorce against appellee, Alejandro Magro. In three issues, Elizabeth contends that the trial court erred in appointing Alejandro as joint managing conservator of their minor child, A.E.M.,

granting Alejandro the exclusive right to designate the primary residence of A.E.M. and make educational decisions for the child, requiring Elizabeth's visitation with A.E.M. to be supervised, and admitting the testimony of certain witnesses at trial.

We affirm.

## Background

In her first amended petition for divorce, Elizabeth sought a divorce from Alejandro, whom she married on February 16, 2013 and separated from on or about July 1, 2017. Elizabeth requested that she and Alejandro be appointed joint managing conservators of A.E.M.,[1] with her being granted the exclusive right to designate A.E.M.'s primary residence. Elizabeth also requested that Alejandro's visitation with A.E.M. be supervised.

In his counterpetition for divorce, Alejandro requested that he and Elizabeth be appointed joint managing conservators of A.E.M., with him being granted the exclusive right to designate A.E.M.'s primary residence. Alejandro also requested that Elizabeth's visitation with A.E.M. be supervised.

The trial court entered a "Band Aid Agreed Temporary Order[]," granting Alejandro possession of A.E.M. at all times, except that Elizabeth was allowed visitation with A.E.M. on certain dates for a period of four hours. Elizabeth's

---

[1] A.E.M. was born on December 28, 2017 during the course of the parties' divorce proceeding. At the time of trial, A.E.M. was thirteen-months old.

2

mother, Maria Flores ("Maria"), was charged with picking up A.E.M. from Alejandro's home and returning A.E.M. to Alejandro's home before and after Elizabeth's periods of visitation. Alejandro was ordered to provide health insurance for A.E.M. The Band Aid Agreed Temporary Order prohibited either party from consuming alcohol or being intoxicated in the presence of A.E.M.

The parties later agreed to a temporary order, which awarded Alejandro possession of A.E.M. at all times, except that Elizabeth was allowed supervised visitation with A.E.M. from 1:00 p.m. to 5:00 p.m. on Sundays, Wednesdays, and Fridays. Elizabeth's mother, Maria, was to pick up A.E.M. from Alejandro's home and return A.E.M. to Alejandro's home before and after Elizabeth's periods of visitation. Maria was also charged with supervising Elizabeth's visits with A.E.M., as was Elizabeth's sister, Inez Flores ("Inez"), on certain designated days. Alejandro was required to provide health insurance for A.E.M. The agreed temporary order prohibited either party from consuming alcohol or being intoxicated in the presence of A.E.M.

In another agreed temporary order, the parties agreed that Elizabeth would provide notice by text message to Alejandro two hours before A.E.M. was to be picked up for Elizabeth's supervised visitation periods.

At trial, Elizabeth's mother, Maria, testified that she is A.E.M.'s grandmother. Maria, in accordance with a temporary order, picks up A.E.M. from Alejandro and

3

drops her back off on the days that Elizabeth has supervised visitation with A.E.M. When Maria arrives to pick up A.E.M., Alejandro puts the child in Maria's car, and Maria drives the child to Elizabeth's home. Maria supervises Elizabeth's visits with A.E.M. Elizabeth takes care of A.E.M. during her visits with the child.

Maria stated that Alejandro does not allow her to take A.E.M. for visitation with Elizabeth when he has not been provided the required notice. Maria did not know whether or not Elizabeth ever provided the required notice to Alejandro, but she stated that Alejandro had denied Elizabeth visitation with A.E.M. about six or seven times in the three months before trial. When Alejandro did this, he simply told Maria that he was not going to give her A.E.M., and Maria did not argue with him. Maria stated that her relationship with Alejandro is okay, and she does not have any problems.

Maria further testified that Elizabeth does not "ha[ve] a drinking problem." But Maria admitted that she had told the amicus attorney at one point during the case that Elizabeth "needed to straighten out her life." Maria stated that Elizabeth has a job, does not drink alcohol or use narcotics, is not a threat to A.E.M., and takes care of A.E.M. when she has possession of her. Elizabeth has two older children—a seventeen-year-old daughter and an eleven-year-old son, A.F. Those children are healthy, have not been arrested, and do not have any problems. Elizabeth is a good mother to them.

4

Maria also testified that she lives "in a compound" with several families, including Elizabeth, living on the same property. On the property, there is a roof that can be accessed through a door. According to Maria, if Elizabeth were to take A.E.M. out on the roof, it would not be safe. The roof does not have a railing, but it is pretty flat. Maria has seen a photograph or a video recording of A.E.M. on the roof with Elizabeth, and A.E.M. was lying on the roof. Elizabeth was not holding the child, but she was there with her. Photographs of the roof, including one with A.F. on top of the roof and one with A.E.M. lying on a blanket on top of the roof when she was about one-month old, were admitted into evidence at trial. The roof was reconstructed around September 2018 because it "looked old."[2]

Elizabeth testified that she married Alejandro on February 16, 2013, and they stopped living together on July 1, 2017. She and Alejandro had one minor child, A.E.M., who was born on December 28, 2017. Elizabeth stated that her marriage to Alejandro had become insupportable because of adultery and cruelty by Alejandro.

In regard to Alejandro, Elizabeth testified that he cheated on her during their marriage, and his girlfriend became pregnant with his child while Elizabeth and Alejandro were married.[3] Elizabeth stated that Alejandro denied having a girlfriend

---

[2]    The roof was reconstructed after the photograph of A.E.M. was taken.

[3]    Elizabeth stated that Alejandro and his girlfriend were no longer dating at the time of trial and Alejandro's purported child with his girlfriend did not live with him.

5

and he denied that the child born to his purported girlfriend was his child. Elizabeth denied cheating on Alejandro during their marriage, but she stated that she had taken a pregnancy test at some point, and had she been pregnant, Alejandro would not have been the father of that child.

Elizabeth also testified that Alejandro was abusive, he hit her throughout their marriage, and he had hit her on more than one occasion. He would hit Elizabeth "[e]very time he drank [alcohol], which [was] very often." Alejandro hit her in front A.F. which was "why [she] filed for divorce." When asked whether Alejandro had ever been arrested for assaulting her, Elizabeth stated: "[W]henever the police were coming, I always changed my mind." She did not "file charges against him."

During Elizabeth's testimony, the trial court admitted into evidence two photographs, which Elizabeth stated showed her injuries after Alejandro hit her in 2017 while she was pregnant. According to Elizabeth, during Memorial Day weekend in 2017, Alejandro "kicked [her] out of the apartment," and after she left, he called her to say that he was "just playing" and she did not have to leave. (Internal quotations omitted.) When Elizabeth went back to the apartment, she found things belonging to Alejandro's purported girlfriend. Elizabeth threw a cup of water at Alejandro, which prompted him to hit her. According to Elizabeth, Alejandro sat on her stomach, choked her, picked her up and body slammed her, scratched her, pinned her arms down, and punched her in the face until she stopped moving. Elizabeth

6

then left. She called law enforcement officers, but no one showed up. She stated that the photographs that the trial court admitted into evidence were taken several days after Alejandro hit her, and it took her a month to heal from her injuries. Elizabeth stated that bruises cannot be seen in the photographs because the bruises she sustained were not visible. Elizabeth testified that she did not save any other photographs depicting injuries she sustained from Alejandro's physical abuse.

Elizabeth further testified that she did not have a problem with drinking alcohol. And as part of her involvement in a case with Child Protective Services ("CPS"), she had to submit to narcotics-use and alcohol-use testing. To her knowledge, she had not tested positive for narcotics use or alcohol use. Elizabeth testified that she was not drinking alcohol at the time that A.E.M. was born. Elizabeth admitted to drinking alcohol while caring for A.E.M., but she stated that she did not become intoxicated. Elizabeth defined intoxication as "being belligerent, being unconscious, blacking out, [and] falling over drunk." According to Elizabeth, when she cares for A.E.M., she does not "drink [alcohol] to get drunk." She is "out there and [she is] tasting it and then [she] . . . leave[s] it behind, and [she] . . . just keep[s] doing what [she is] doing." She does not "sit[] down and just drink[]" alcohol to become intoxicated; she is "conscious." Elizabeth stated that she drinks alcohol socially and not often.

7

Elizabeth also admitted that, in March 2018, when Alejandro called law enforcement officers to come to her home, she had been drinking alcohol, but stated that she was not intoxicated. Elizabeth let Alejandro take A.E.M. and A.F. to his home that night. Elizabeth also noted that law enforcement officers came to her home in January 2019, when she refused to give A.E.M. to Alejandro's sister after a visit. Elizabeth stated that she did not drink alcohol that day, but one of the officers said that she smelled of alcohol.

Elizabeth further testified that Alejandro drinks alcohol often. During their relationship, he would drink a lot of alcohol and would fall asleep on the couch. When Elizabeth confronted Alejandro about his girlfriend's belongings, during Memorial Day weekend in 2017, he had been drinking alcohol.

As to A.E.M., Elizabeth stated that Alejandro provides health insurance for A.E.M. Elizabeth also admitted to taking A.E.M. on the roof at Maria's property. Elizabeth testified that she wanted to be named joint managing conservator of A.E.M. and to be granted the exclusive right to designate A.E.M.'s primary residence and to make educational decisions for A.E.M. In the alternative, she stated that if the trial court found that family violence had been committed, she wanted to be named sole managing conservator of A.E.M. According to Elizabeth, A.E.M. and A.F. were close, and he sees A.E.M. about once a week under the parties'

visitation schedule. Elizabeth does not have primary custody of her seventeen-year-old daughter.

Elizabeth also testified that her home is clean and she does not have any pets because A.F. is allergic to flea and ant bites. The trial court admitted into evidence photographs of bug bites and blisters on A.E.M., which Elizabeth stated A.E.M. received while in Alejandro's care. Elizabeth was concerned about the blisters and bites that A.E.M. had received while in Alejandro's care, and she took A.E.M. to the emergency room for treatment. At the hospital, she was told to put ointment on the blisters or bites. A.E.M. also suffered ear infections while in Alejandro's care. On November 11, 2018, when Elizabeth received possession of A.E.M. from Alejandro, A.E.M. was very dirty. Elizabeth expressed concern that Alejandro did not clean A.E.M. properly and that her ears were always dirty.

Additionally, Elizabeth stated that she had never dropped A.E.M., had not abandoned A.E.M., and had not abandoned A.E.M. due to intoxication. And as part of her CPS case, she participated in parenting classes, went to therapy, and "did some alcohol-related program." Elizabeth does not attend Alcoholics Anonymous because she does not need it.

Angelina Cerda Flores ("Angelina"), Elizabeth's sister-in-law, testified that in October 2017, Alejandro "admitted to getting rough" with Elizabeth. According to Angelina, Alejandro told her about an incident that occurred before Elizabeth was

9

pregnant, stating that he "g[o]t rough with her." Alejandro said he regretted it and that it was the cause of their divorce. Angelina never witnessed Alejandro physically attack Elizabeth.

Narciso Flores ("Narciso"), Elizabeth's brother, testified that he saw Alejandro hit Elizabeth at a barbecue in 2015. On that day, Narciso drank alcohol. According to Narciso, he woke up around 1:00 a.m. or 2:00 a.m., heard Elizabeth screaming, and saw Alejandro hitting Elizabeth. Narciso grabbed Alejandro and put him in a headlock. Alejandro's friends then got him, and they left the barbecue. Afterwards, Elizabeth's head hurt, and she cried. Law enforcement officers were not called. Narciso could not tell whether or not Alejandro was intoxicated that night, and he did not know whether Elizabeth had been drinking alcohol that day. According to Narciso, Elizabeth drinks alcohol socially.

Narciso also testified that Elizabeth is a good mother, and she takes care of A.E.M. Elizabeth does not drink alcohol around the child. Narciso has never known Elizabeth to endanger A.E.M., and he does not have a reason to believe that she would be a threat to A.E.M.

Inez, Elizabeth's sister, testified that she has not known Alejandro to be physically violent with Elizabeth. But she has seen Alejandro curse at Elizabeth, call her names, and yell at her.

Inez also testified that on January 13, 2019, law enforcement officers were called to Elizabeth's home because Alejandro's sister, not Alejandro, came to pick up A.E.M. after Elizabeth's visit with the child. When law enforcement officers arrived, they did "[n]othing." But Inez noted that she was inside the house at the time. Elizabeth gave A.E.M. to Alejandro's sister.

According to Inez, while in Elizabeth's possession on January 13, 2019, A.E.M. was happy; she played with other children and took a nap. Inez did not remember whether Elizabeth drank alcohol that day, and she did not see Elizabeth drinking alcohol. Inez drank alcohol earlier in the day at a restaurant with Elizabeth, A.E.M., Inez's boyfriend, and Inez's daughter and nephew. Elizabeth was acting normally, was not a threat to A.E.M., and was not abusing or endangering the child. Inez noted that Elizabeth brought A.E.M. to Inez's home on January 13, 2019 without any supervision.

Inez testified that Elizabeth did not have a "drinking problem." Elizabeth cares a lot about A.E.M., and she loves her.

Rosalina Flores ("Rosalina"), Elizabeth's sister, testified that Alejandro drinks alcohol socially, but she has never paid attention to how much alcohol he drinks. Elizabeth also drinks alcohol socially, but she does not drink a lot of alcohol. At the time of trial, Elizabeth did not drink alcohol at all.

Rosalina stated that in November 2016, on a family vacation, she saw Alejandro verbally abuse Elizabeth. Rosalina stated that Alejandro was also physically abusing Elizabeth at the time, but Rosalina could not explain how Alejandro physically abused Elizabeth or what physical action was taken by Alejandro against Elizabeth. Later during her testimony, Rosalina stated that Alejandro pushed and hit Elizabeth. Also, at a sporting event in January 2017, Alejandro and Elizabeth started arguing, and he pushed her. Alejandro was drinking alcohol that day.

Andreas Flores ("Andreas"), Elizabeth's brother, testified that he has not seen Alejandro and Elizabeth fight. Andreas has seen Alejandro drink alcohol at social gatherings and become highly intoxicated. Alejandro has not been aggressive with Andreas when he drinks alcohol. Elizabeth drinks alcohol socially. Andreas also stated that Elizabeth takes care of A.E.M. and she has not endangered A.E.M. Andreas did not see Elizabeth take A.E.M. on top of the roof.

Lekeyicia Smiley testified that she is involved with the parties as a CPS caseworker. Smiley stated that she was placed on the parties' CPS case in December 2018, and she had met with Elizabeth and Alejandro. Smiley visited the daycare that A.E.M. attended, and the daycare personnel spoke highly of Alejandro. CPS had not received any allegations that Alejandro was a danger to A.E.M.

12

According to Smiley, Elizabeth had completed all of the requirements in her CPS case. The only remaining concern that CPS had with regard to Elizabeth is that a doctor had recommended that tubes by placed in A.E.M.'s ears because of her frequent ear infections and Elizabeth did not want that to be done. In January 2019, Smiley requested that Elizabeth submit to a narcotics-use and alcohol-use test, but Elizabeth did not do so. Because of this, Elizabeth's testing was deemed positive for narcotics use and alcohol use. According to Smiley, the January 2019 positive result was the only positive testing result that Elizabeth had received during her CPS case. To Smiley's knowledge, since she received the CPS case in December 2018—about two months before trial in this case—Elizabeth had not abused A.E.M., physically harmed A.E.M., or placed A.E.M. in a position where her life was threatened. Smiley stated that Elizabeth did not pose a threat to A.E.M. Elizabeth is sweet with A.E.M., and A.E.M. appears to be bonded and attached to Elizabeth. A.E.M. also appears bonded with A.F. Elizabeth's home is suitable and does not contain hazards.

Houston Police Department ("HPD") Officer C. Welch stated that on March 5, 2018, he responded to a call involving Elizabeth and two children who had been allegedly left alone unsupervised. Welch was dispatched to Elizabeth's home, and when he arrived, he found Alejandro, who had come from work and was outside the home in his truck with A.E.M. and A.F. After speaking with Alejandro, Welch

13

accompanied Alejandro inside Elizabeth's home so that Alejandro could collect the children's belongings. At the time, Welch was investigating a possible endangerment of a child or abandonment of a child situation.

According to Officer Welch, Elizabeth's home was in disrepair and disheveled. Inside the home, Welch saw "numerous amounts of beer[] [and] beer cans[] . . . scattered throughout the residence." While Alejandro collected the children's belongings, Welch attempted to find Elizabeth and called out, but there was no response. Eventually, Elizabeth came out of the back portion of the house, stumbled into the kitchen, and grasped at objects as she made her way into the kitchen. She braced herself against the kitchen sink and faced away from Welch. When Welch tried to speak with Elizabeth, she was passive, "almost trying to ignore the fact that [law enforcement officers] were actually there." Elizabeth would not answer any questions, and her demeanor was odd. Welch could smell a very strong odor of alcohol on Elizabeth's person, and based on his training and experience as a law enforcement officer and Elizbeth's demeanor, Welch believed that Elizabeth was heavily under the influence of alcohol.[4] When Welch tried to question Elizabeth about A.E.M. and A.F. being left alone, she stated that she was in the house the entire time, but she would not provide details and deflected other questions directed at her.

---

[4]     Officer Welch stated that he did not actually see Elizabeth consume alcohol. He also testified that there was a car parked in front of Elizabeth's home that contained alcoholic beverages.

14

According to Welch, no one other than Elizabeth was in the home; only Elizabeth, A.E.M., and A.F. would have been in the home during the relevant time.[5]

Officer Welch further testified that Elizabeth allowed Alejandro to take both A.E.M. and A.F. to his home that night. Welch completed "an incident report[,] entitled endangering or abandonment of a child," and he filed a report with CPS.

HPD Officer J. Correa testified that he, along with Officer Welch, responded to a call on March 5, 2018 and went to Elizabeth's home. When Correa arrived, Alejandro was in his truck with A.E.M. and A.F. waiting for law enforcement officers to arrive. After speaking with Alejandro, Correa accompanied Alejandro inside Elizabeth's home so that Alejandro could get A.E.M.'s belongings and take her home with him.

Inside Elizabeth's home, Officer Correa saw a six pack of beer. Eventually, Elizabeth came into the kitchen where Correa was standing. Correa could smell the scent of an alcoholic beverage coming from her. Elizabeth's eyes were red and glassy, and her speech was slurred. Correa could not understand what Elizabeth was saying. From his experience as a law enforcement officer, Correa knew that Elizabeth had drunk alcohol that day, but he did not know how much.

---

[5] According to Officer Welch, another family member was in a separate, detached building behind Elizabeth's home. That family member did not indicate that she had been watching A.E.M. or A.F. that day.

Officer Correa testified that Elizabeth's sister was present at some point while law enforcement officers were at Elizabeth's home. But both Alejandro and A.F. reported to law enforcement officers that Elizabeth had been gone from the house for two hours while A.F. and A.E.M. were left there alone. No one reported to Correa that Elizabeth's sister was present at the house during the two hours when Elizabeth was not there.

HPD Officer Rivera stated that on January 13, 2019—about a month before trial in this case—he responded to a call related to Elizabeth and A.E.M. Elizabeth did not want to give A.E.M. to Alejandro's sister at the end of her visit with the child. Upon arrival, Rivera spoke with Elizabeth, and Elizabeth eventually gave A.E.M. to Alejandro's sister. According to Rivera, at the time, Elizabeth had repetitive speech, red, glassy eyes, and a strong odor of alcoholic beverage on her breath. Rivera stated that Elizabeth initially caused a disturbance by refusing to turn over A.E.M.

Alejandro testified that he is A.E.M.'s father. A.E.M. has been in his care since March 2018. Alejandro is employed as a superintendent by a company that does civil highway construction. He has held that job for ten years and normally works Monday through Friday from 7:00 a.m. to 4:00 p.m. Alejandro works on Saturdays twice a month, which sometimes requires him to work late or early depending on the type of job on which he is working. For instance, when Alejandro

16

had to work around 2:00 a.m. on Saturday, June 2, 2018, his mother watched A.E.M. As a requirement of his job, Alejandro participates in random narcotics-use testing.

While A.E.M. has been living with Alejandro during the pendency of this case, a typical workday involves his waking up around 5:30 a.m. and getting ready. He then gets A.E.M. ready, and they leave the house around 6:15 a.m. so that he can drive her to daycare. Alejandro described A.E.M.'s daycare as clean. A.E.M. is in the toddler class at daycare, and Alejandro receives pictures and video recordings of A.E.M. from her daycare throughout the day. He also receives reports about what A.E.M. eats while at daycare. Alejandro leaves work around 4:00 p.m. and picks A.E.M. up from daycare. They go home, do activities, watch television, and eat. A.E.M. goes to sleep by 8:00 p.m. or 9:00 p.m., and Alejandro goes to bed afterwards. According to Alejandro, A.E.M. is adjusted to the routine that he has installed.

While A.E.M. has been in his care, Alejandro has taken A.E.M. to doctor's appointments.[6] A.E.M. has had ear infections, hand, foot, and mouth disease, and a fever. Alejandro explained that hand, food, and mouth disease causes a rash on a child's hands, legs, arms, and throat. It is contagious, and A.E.M. contracted it after she started attending daycare. Alejandro took A.E.M. to the doctor, who told him to put cream on the rash and that it would go away within ten days. As for A.E.M.'s

---

[6] The trial court admitted into evidence copies of A.E.M.'s medical records.

ear infections, Alejandro had planned to have tubes put in the child's ears to help with her ear infections, but that had not yet been done because Elizabeth was opposed to the procedure. Alejandro testified that A.E.M. is prone to getting ear infections whenever she gets a cold.

Alejandro also stated that there has been conflict between Elizabeth and himself about the medical care A.E.M. receives and Elizabeth oftentimes takes A.E.M. to the emergency room even when Alejandro has just taken the child to see a doctor. For instance, when A.E.M. had hand, foot, and mouth disease, Alejandro told Elizabeth that A.E.M. was sick, sent Elizabeth the doctor's reports, and emailed Elizabeth instructions for taking care of A.E.M. But when Elizabeth had visitation with A.E.M. the next day, she took her to the emergency room. Alejandro stated that A.E.M. has received mosquito bites while in his care.

In regard to Elizabeth's visitation with A.E.M., Alejandro stated Elizabeth has visitation with A.E.M. on Sundays, Wednesdays, and Fridays from 1:00 p.m. to 5:00 p.m. Alejandro has denied Elizabeth possession of A.E.M. on certain days when she has not given him the required two-hours' notice before A.E.M. is picked up.[7] Law enforcement officers have come to his home about six times since A.E.M.

_____

[7] According to Alejandro, he needs two-hours' notice before Elizabeth's visits with A.E.M. because it takes him an hour to get from work to A.E.M.'s daycare and another thirty minutes to then drive home. It is important for him to have notice so that he can tell his employer that he has to leave on a Wednesday or Friday.

18

came into his care because Elizabeth has either dropped off A.E.M. late or he has not given A.E.M. to Elizabeth.

In March 2018, Alejandro, while at work, received a text message from A.F. After receiving the text message, Alejandro called for emergency assistance so that a law enforcement officer could do a welfare check at Elizabeth's home because he was concerned about the safety of A.F. and A.E.M., who were both in Elizabeth's care at the time. A.F. was ten years old and A.E.M. was two-months old. After calling for emergency assistance, Alejandro called A.F. and asked him where Elizabeth was. A.F. told him, "She's not here." (Internal quotations omitted). During the telephone call, Alejandro could hear A.E.M. crying in the background. Alejandro then left work and went to Elizabeth's home.

When Alejandro arrived at Elizabeth's home, it was dark. He called A.F. and told him to come outside with A.E.M. Alejandro, A.F., and A.E.M. waited in Alejandro's truck for law enforcement officers to arrive. While sitting outside, Alejandro could see Elizabeth's home, which was empty. A.F. told him that no one was inside.

After law enforcement officers arrived, Alejandro told them that he needed to go into Elizabeth's home because A.F. had school the next day and both A.F. and A.E.M. needed clothes and some belongings. When Alejandro entered Elizabeth's home with the law enforcement officers, Rosalina, Elizabeth's sister, was not

19

inside.[8] Elizabeth consented to Alejandro's taking both A.E.M. and A.F. with him back to his home that night. CPS contacted Alejandro the next day, and a CPS officer came to his home to talk to him about the March 2018 incident.

In regard to any physical abuse between himself and Elizabeth, Alejandro testified that he had never hit Elizabeth and he denied Elizabeth's and her family members' allegations. He stated that Elizabeth and her family members were lying. Alejandro also denied that he and Elizabeth had a fight on a family vacation in 2016. And Alejandro did not recall the headlock incident that Narciso, Elizabeth's brother, testified about. According to Alejandro, he does not drink alcohol often, but Elizabeth does.

Alejandro further testified that he did not have an extramarital affair. He explained that he and Elizabeth first separated on December 30, 2015 after he came home and Elizabeth was not there. When Elizabeth came home, she was intoxicated and talking to another man on her cellular telephone. That man was present in the courtroom during trial in this case. Because Elizabeth had cheated on him, he and Elizabeth had separated.

---

[8] According to Alejandro, Elizabeth's sister, Rosalina, lives in another structure behind Elizabeth's home.

Alejandro requested that the trial court maintain the conservatorship arrangement in place at the time of trial and allow him to determine A.E.M.'s primary residence.

In its final decree of divorce, the trial court dissolved the parties' marriage on the ground of insupportability. It appointed Elizabeth and Alejandro as joint managing conservators of A.E.M. It granted Alejandro the exclusive right to designate the primary residence of A.E.M. in Harris County and contiguous counties, to make decisions about A.E.M.'s education, and to enroll A.E.M. in school. The trial court ordered Alejandro to maintain health insurance for A.E.M. The trial court granted Elizabeth standard visitation and required that her visitation with A.E.M. be supervised by Elizabeth's mother, Maria. It ordered Elizabeth to pay Alejandro $547.03 in monthly child support and an additional $87.16 per month for health insurance reimbursement. Elizabeth moved for a new trial, which the trial court denied.[9]

---

[9] The docket sheet indicates that the motion for new trial was denied, but there is no order in the clerk's record and there is no reporter's record of a hearing on the motion. Because the docket sheet entry is not a substitute for a written order, we treat the motion for new trial as overruled by operation of law. *See* TEX. R. CIV. P. 329b(c); *In re Lovito-Nelson*, 278 S.W.3d 773, 775–76 (Tex. 2009) (orig. proceeding); *In re E.E.*, No. 14-16-00685-CV, 2017 WL 4273194, at *1 n.1 (Tex. App.—Houston [14th Dist.] Sept. 26, 2017, no pet.) (mem. op.).

21

## Standard of Review

Conservatorship determinations made after a bench trial are "subject to review only for abuse of discretion." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to guiding rules or principles. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). Under an abuse-of-discretion standard, legal and factual insufficiency are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). We consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of discretion. *Id.* A trial court does not abuse its discretion if it bases its decisions on conflicting evidence or so long as there is some evidence of substantive and probative character to support the trial court's decision. *Id.*; *see also In re C.A.M.M.*, 243 S.W.3d 211, 214 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

When no findings of fact or conclusions of law are requested or filed, as here, we imply all facts necessary to support the judgment that are supported by the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). We affirm the trial court's judgment if it can be upheld on any legal theory finding support in the evidence. *Id.*

## Joint Managing Conservator

In her first issue, Elizabeth argues that the trial court erred in appointing Alejandro as joint managing conservator of A.E.M. because she presented credible evidence of a pattern or history of family violence.

When determining issues of conservatorship, possession of, and access to a child, the best interest of the child is the primary consideration. *See* TEX. FAM. CODE ANN. § 153.002. The trial court is afforded great discretion when making conservatorship determinations. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Baker v. Baker*, 469 S.W.3d 269, 273 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The trial court is in the best position to determine what will be in the best interest of a child, since the trial court faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent. *Martinez v Molinar*, 953 S.W.2d 399, 403 (Tex. App.—El Paso 1997, no writ); *Altamirano v. Altamirano*, 591 S.W.2d 336, 338 (Tex. App.—Corpus Christi–Edinburg 1979, no writ); *see also Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.) ("The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record.").

The law presumes that the appointment of both parents as joint managing conservators is in the best interest of the child. *See* TEX. FAM. CODE ANN.

§ 153.131(b). But the trial court may not appoint the parents as joint managing conservators if credible evidence is presented of a history or pattern of physical abuse by one parent directed against the other parent. *Id.* § 153.004(b).

When, as here, the trial court is the fact finder, it is the sole judge of the weight and credibility of the evidence; if it does not find credible evidence of a history or pattern of physical abuse, it is not bound by Texas Family Code section 153.004 and may appoint both parents as joint managing conservators. *In re Marriage of Harrison*, 557 S.W.3d 99, 127–28 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *see also Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.) ("Because the district court obviously did not find the testimony to be credible evidence of a history of sexual abuse, it was not bound by section 153.004(b)."). Because section 153.004 does not define "history" or "pattern," courts use a factual analysis, considering both the number and kinds of acts involved when determining whether the appointment of joint managing conservators is barred. *See Hinojosa v. Hinojosa*, No. 14-11-00989-CV, 2013 WL 1437718, at *4 (Tex. App.—Houston [14th Dist.] Apr. 9, 2013, no pet.) (mem. op.). Although a single incident of physical violence could constitute a history of physical abuse, the trial court also may consider the participants' explanations of what occurred and the amount of time that elapsed since the incident in question in determining whether a

history or pattern of abuse is shown.  *See Alexander v. Rogers*, 247 S.W.3d 757, 762–63 (Tex. App.—Dallas 2008, no pet.).

Elizabeth testified that Alejandro was abusive and hit her during their marriage.  According to Elizabeth, Alejandro hit her every time that he drank alcohol, which was often.  During Elizabeth's testimony, the trial court admitted into evidence two photographs which Elizabeth stated showed injuries after Alejandro hit her during Memorial Day weekend in 2017.  According to Elizabeth, after finding Alejandro's purported girlfriend's belongings in the apartment, she threw a cup of water at Alejandro, which prompted him to hit her.  Elizabeth stated that Alejandro sat on her stomach, choked her, picked her up and body slammed her, scratched her, pinned her arms down, and punched her in the face until she stopped moving. Elizabeth then left.  She called law enforcement officers, but no one showed up.  She stated that the photographs were taken several days after Alejandro hit her, and it took her a month to heal from her injuries.  Elizabeth stated that bruises cannot be seen in the photographs because her bruises were not visible.  Elizabeth did not save any other photographs depicting injuries she sustained from Alejandro's physical abuse.  Alejandro was never arrested for assaulting her at any point during their marriage.

Alejandro disputed Elizabeth's testimony about his physical abuse and denied Elizabeth's allegations against him.  He also testified that he had never hit her.  *Cf.*

25

*In re Marriage of Harrison*, 557 S.W.3d at 128–30 (parent disputed and denied other parent's testimony about history of domestic violence); *see also Burns v. Burns*, 116 S.W.3d 916, 921 (Tex. App.—Dallas 2003, no pet.) (trial court did not err in appointing father joint managing conservator where nothing in record undisputedly showed history or pattern of violence).

Some of Elizabeth's family members also testified about Alejandro's purported physical abuse of Elizabeth. Angelina, Elizabeth's sister-in-law, stated that Alejandro admitted to her that he had "g[otten] rough" with Elizabeth, but Angelina stated that she had never witnessed Alejandro physically attacking Elizabeth. And Narciso, Elizabeth's brother, testified that, in 2015, around 1:00 a.m. or 2:00 a.m. one night, he saw Alejandro hit Elizabeth. Narciso grabbed Alejandro and put him in a headlock. According to Narciso, Alejandro had been drinking alcohol earlier in the day and law enforcement officers were not called after the incident.

Alejandro testified that he did not recall that the headlock incident Narciso described took place, and he disputed Angelina's and Narciso's testimony. *See Burns*, 116 S.W.3d at 921.

Inez, Elizabeth's sister, testified that she had not known Alejandro to be physically violent with Elizabeth. And Andreas, Elizabeth's brother, stated that he

26

had not seen Elizabeth and Alejandro fight and Alejandro had never been aggressive with him even when Alejandro was drinking alcohol.

Rosalina, Elizabeth's sister, stated that on a family vacation in November 2016, she saw Alejandro physically abuse Elizabeth, but Rosalina could not explain how Alejandro had physically abused Elizabeth or what physical action was taken by Alejandro against Elizabeth. Later during her testimony, Rosalina stated that Alejandro had pushed and hit Elizabeth. She also stated that, at a sporting event in January 2017, Alejandro and Elizabeth started arguing and he pushed her.

During his testimony, Alejandro specifically denied fighting with Elizabeth on a family vacation in 2016, and he also disputed Rosalina's testimony. *See id.*

The trial court is the sole judge of the weight and credibility of the evidence. *See In re Marriage of Harrison*, 557 S.W.3d at 130. And when the parties offer conflicting evidence, the fact finder is permitted to reject one party's version. *See Alexander*, 247 S.W.3d at 764; *see also In re L.G.K.S.*, No. 12-18-00178-CV, 2019 WL 4462693, at *5 (Tex. App.—Tyler Sept. 18, 2019, no pet.) (mem. op.) ("In its role as factfinder, the trial court was entitled to choose which account to believe and could have reasonably credited [one parent's] version of events."). Further, because the record contains no findings of fact and conclusions of law, it is implicit in the trial court's judgment that it found that there was no credible evidence of a history or pattern of physical abuse by Alejandro. *See Burns*, 116 S.W.3d at 920–21.

27

Because the trial court could have reasonably found no credible evidence of a history or pattern of physical abuse by Alejandro, the Texas Family Code did not prohibit the trial court from appointing Alejandro as joint managing conservator of A.E.M. *See Alexander*, 247 S.W.3d at 764; *In re Marriage of Harrison*, 557 S.W.3d at 127–28 (if trial court does not find credible evidence of history of physical abuse, it is not bound by section 153.004(b) and may appoint parent as joint managing conservator); *Burns*, 116 S.W.3d at 921 (no abuse of discretion in appointing husband as joint managing conservator with exclusive right to designate primary residence of children when conflicting evidence that husband abused wife was presented and nothing in record undisputedly showed pattern of abuse). Thus, we hold that the trial court did not err in appointing Alejandro as joint managing conservator of A.E.M.

We overrule Elizabeth's first issue.

## Exclusive Right

In a portion of her second issue, Elizabeth argues that the trial court erred in granting Alejandro the exclusive right to designate the primary residence of A.E.M. and make decisions about A.E.M.'s education because the evidence is legally and factually insufficient to support the trial court's decision.

We review a trial court's a determination of which conservator will have the exclusive right to designate the child's primary residence and make educational

28

decisions for the child under an abuse-of-discretion standard. *In re J.A.J.*, 243 S.W.3d at 616; *Wright v. Berger*, No. 01-18-00964-CV, 2020 WL 1917839, at *4 (Tex. App.—Houston Apr. 21, 2020, no pet.) (mem. op.). To determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in its application of its discretion. *Wright*, 2020 WL 1917839, at *4; *see also In re A.J.E.*, 372 S.W.3d 696, 698–99 (Tex. App.—Eastland 2012, no pet.).

In regard to the first question, the traditional sufficiency of evidence review comes into play. *See In re A.J.E.*, 372 S.W.3d at 698–99; *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.). We then proceed to determine whether the trial court made a reasonable decision based on the elicited evidence. *In re A.J.E.*, 372 S.W.3d at 698–99. The trial court does not abuse its discretion so long as the record contains some evidence of substantive and probative character to support the trial court's decision. *In re J.J.G.*, 540 S.W.3d at 55; *In re C.A.M.M.*, 243 S.W.3d at 214. The fact that a trial court may decide a matter within its discretionary authority in a different manner from an appellate court in a similar circumstance does not demonstrate an abuse of discretion. *In re C.A.M.M.*, 243 S.W.3d at 214–15.

In conducting a legal-sufficiency review in a conservatorship case, we review all of the evidence in a light favorable to the challenged finding, crediting favorable evidence if a reasonable fact finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 810, 827 (Tex. 2005). We will sustain a legal-sufficiency or "no-evidence" challenge if (1) the record shows a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

In conducting a factual-sufficiency review in a conservatorship case, we consider and weigh all the evidence in a neutral light and will set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Wright*, 2020 WL 1917839, at *5.

When the trial court appoints both parents as joint managing conservators, it must specify the rights and duties of conservatorship that each parent may exercise, but it is not required to award those rights equally or require that they be exercised jointly. *See* TEX. FAM. CODE ANN. § 153.071; *Wright*, 2020 WL 1917839, at *5. The trial court must designate the conservator "who has the exclusive right to

determine the primary residence of the child," either with or without geographic limitations. *See* TEX. FAM. CODE ANN. § 153.134(b)(1); *Wright*, 2020 WL 1917839, at \*5; *In re Marriage of Christensen*, 570 S.W.3d 933, 938 (Tex. App.—Texarkana 2019, no pet.). The trial court must also designate the conservator who will make decisions concerning the child's education. *See* TEX. FAM. CODE ANN. § 151.001(a)(10); *Rogers v. Rogers*, No. 01-15-00224-CV, 2016 WL 3162299, at \*4 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (mem. op.).

Suits affecting the parent-child relationship are intensely fact driven. *See Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002); *Wright*, 2020 WL 1917839, at \*5. In determining which joint managing conservator should have the exclusive right to designate the child's primary residence or make decisions concerning the child's education, the best interest of the child shall always be the primary consideration. *See* TEX. FAM. CODE ANN. § 153.002; *Smith v. Payandeh*, No. 01-18-000463-CV, 2019 WL 2528197, at \*5 (Tex. App.—Houston [1st Dist.] June 20, 2019, no pet.) (mem. op.). And the trial court is given wide latitude in determining the best interests of a child. *Gillespie*, 644 S.W.2d at 451.

The trial court may consider a non-exhaustive list of factors in making its best-interest determination, though it need not address all of the factors or limit its inquiry to these factors. *See Wright*, 2020 WL 1917839, at \*6; *Payandeh*, 2019 WL 2528197, at \*5–6. The trial court may consider: (1) the desires of the child; (2) the

31

emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the act or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and no single factor is controlling. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *Holley*, 544 S.W.2d at 371–72. And the presence of a single factor may, in some instances, be adequate to support a best-interest finding. *See Payandeh*, 2019 WL 2528197, at \*6; *M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied).

Elizabeth argues that the evidence is insufficient to support the trial court's decision to grant Alejandro the exclusive right to designate A.E.M.'s primary residence and make educational decisions for A.E.M. because A.E.M., more than once, received bug bites while in Alejandro's care, there was no evidence that Alejandro did anything about the bug bites sustained by A.E.M., Alejandro drinks alcohol often and becomes angry when he does so, and Alejandro has denied Elizabeth visitation with A.E.M.

Contrary to Elizabeth's argument, the evidence presented at trial supports the trial court's decision. This evidence is relevant to the following best-interest factors: A.E.M.'s emotional and physical needs now and in the future, the emotional and physical danger to A.E.M. now and in the future, parental abilities, stability of the parents' home, and the acts or omissions of the parents. *See Holley*, 544 S.W.2d at 371–72. It includes:

- A.E.M. has been in Alejandro's care since March 2018,[10] and Elizabeth has had supervised visitation since that time;

- Alejandro is employed as a superintendent by a company that does civil highway construction, and he is required to participate in random narcotics-use testing due to the nature of his job;

- While Alejandro is at work, A.E.M. attends a daycare that is clean;

- Alejandro receives photographs and video recordings of A.E.M. throughout the day while she is at daycare, and he receives a daily report from the daycare about what A.E.M. eats;

- The daycare personnel speak highly of Alejandro;

- Alejandro has created a routine for A.E.M., which consists of Alejandro waking A.E.M. up in the morning, taking her to daycare on the way to work, picking her up from daycare, taking her home to do activities and to eat, A.E.M. going to sleep by 8:00 p.m. or 9:00 p.m., and Alejandro going to sleep afterwards;

- If Alejandro works on a Saturday, his mother watches A.E.M.;

- Alejandro takes A.E.M. to doctor's appointments;

---

[10] At the time of trial, A.E.M. had been in Alejandro's care for almost a year and for most of her life.

33

- When A.E.M. had ear infections and hand, foot, and mouth disease, Alejandro sought medical treatment for her;

- Alejandro has also sought medical treatment for A.E.M.'s bug bites;

- Alejandro planned to have tubes put in A.E.M.'s ears to help with her ear infections, which Elizabeth was against;

- When A.E.M. was sick with hand, foot, and mouth disease, Alejandro informed Elizabeth that A.E.M. was sick, sent Elizabeth the doctor's report, and emailed Elizabeth instructions for taking care of A.E.M.;

- On March 5, 2018, A.F. reported that Elizabeth had left him and A.E.M., who was two-months old at the time, home alone for two hours. Alejandro called law enforcement officers to perform a welfare check and left work. When Alejandro arrived at Elizabeth's home it was dark and neither Elizabeth nor any other adult was there;

- On March 5, 2018, when law enforcement officers, who were at Elizabeth's home to investigate a possible endangerment of a child or abandonment of a child situation, went into the home, it was in disrepair and disheveled. Law enforcement officers saw large amounts of beer and beer cans scattered throughout the home;

- On March 5, 2018, when law enforcement officers encountered Elizabeth in her home, she had a strong odor of alcohol coming from her person, her eyes were red and glassy, and her speech was slurred. The officers believed Elizabeth to be heavily under the influence of alcohol. No one other than Elizabeth was in the home;

- On March 5, 2018, Officer Welch saw a car in front of Elizabeth's home containing alcoholic beverages;

- On January 13, 2019, law enforcement officers responded to a call related to Elizabeth and A.E.M. because Elizabeth did not want to return A.E.M. at the end of her visitation period;

- On January 13, 2019, when officers responded to a call at Elizabeth's home, a law enforcement officer observed that Elizabeth had repetitive

speech, red, glassy eyes, and a strong odor of alcoholic beverage on her breath;

- Alejandro does not drink alcohol often;

- Alejandro has never hit Elizabeth;

- While A.E.M. was in Elizabeth's care she took the child outside on top of a roof and laid her down on a blanket on top of the roof;

- Elizabeth admitted to drinking alcohol while caring for A.E.M.;

- CPS has not received any allegations that Alejandro is a danger to A.E.M.; and

- In January 2019, Elizabeth received a positive result on her narcotics-use and alcohol-use testing results because she did not appear for her testing.

As noted above, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony. *See Payandeh*, 2019 WL 2528197, at *7; *Bush*, 336 S.W.3d at 730. The trial court is best able "to observe the demeanor and personalities of the witnesses and [to] 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols*, 85 S.W.3d at 477; *see also Payandeh*, 2019 WL 2528197, at *7; *Martinez*, 953 S.W.2d at 403. And we will not re-weigh the evidence bearing on the trial court's implied best-interest determination in this case. *See City of Keller*, 168 S.W.3d at 819; *Payandeh*, 2019 WL 2528197, at *7. Further, because there are no findings of fact or conclusions of law, we must assume that the

35

trial court found all disputed facts in favor of its decision. *See Wright*, 2020 WL 1917839, at \*6; *Strong v. Strong*, 350 S.W.3d 759, 765 (Tex. App.—Dallas 2011, pet. denied).

Having reviewed the evidence in this case under the appropriate standards, we conclude that the record contains sufficient evidence for the trial court to have exercised its discretion to grant Alejandro the exclusive right to designate A.E.M.'s primary residence and make educational decisions for A.E.M. *See Payandeh*, 2019 WL 2528197, at \*7. Thus, we hold that the trial court did not err in granting Alejandro the exclusive right to designate the primary residence of A.E.M. and make decisions about A.E.M.'s education.

We overrule this portion of Elizabeth's second issue.

## Visitation

In the remaining portion of her second issue, Elizabeth argues that the trial court erred in ordering Elizabeth's visitation with A.E.M. to be supervised because the evidence is legally and factually insufficient to support the trial court's decision.

The trial court has broad discretion in fashioning the terms of a final decree related to visitation and possession. *In re Doe 2*, 19 S.W.3d 278, 281–82 (Tex. 2000); *Gillespie*, 644 S.W.2d at 451; *In re Marriage of Swim*, 291 S.W.3d 500, 504 (Tex. App.—Amarillo 2009, no pet.). Thus, in determining issues of custody, control, possession, and visitation, we will reverse a trial court's order only if it

appears from the record as a whole that the trial court abused its discretion. *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied); *Newberry v. Newberry*, 351 S.W.3d 552, 558 (Tex. App.—El Paso 2011, no pet.) (trial court's ruling on visitation reviewed under abuse-of-discretion standard). The public policy of Texas is to ensure that a child enjoys "frequent and continuing contact with parents who have shown the ability to act in the best interest of the child" and to "encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage." TEX. FAM. CODE ANN. § 153.001(a); *see also In re N.P.M.*, 509 S.W.3d 560, 564 (Tex. App.—El Paso 2016, no pet.).

The best interest of the child is the primary consideration of the court in determining questions of possession and visitation. *See* TEX. FAM. CODE ANN. § 153.002; *In re P.A.C.*, 498 S.W.3d 210, 216 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Roosth v. Roosth*, 889 S.W.2d 445, 451 (Tex. App.—Houston [14th Dist.] 1994, writ denied). And a trial court is permitted to place conditions on a parent's visitation, such as requiring supervised visitation, when it is in the child's best interest to do so. *In re A.G.*, 531 S.W.3d 329, 333 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re R.D.Y.*, 51 S.W.3d 314, 324 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The terms of an order that imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed

those that are required to protect the best interests of the child. *See* TEX. FAM. CODE ANN. § 153.193; *In re P.A.C.*, 498 S.W.3d at 216; *see also* TEX. FAM. CODE ANN. § 153.251; *In re C.B.M.*, 14 S.W.3d 855, 858 (Tex. App.—Beaumont 2000, no pet.) ("Statutory guidelines for possession of a child by a parent named as a possessory conservator are intended to guide the courts in ordering the terms and conditions for . . . the minimum possession for a joint managing conservator."). Although a trial court ordering supervised visitation may not be common when a parent is granted joint managing conservatorship, it may be appropriate when dictated by the circumstances. *In re P.A.C.*, 498 S.W.3d at 219; *see, e.g.*, *Payandeh*, 2019 WL 2528197, at *4, *7 (ordering  supervised visitation for parent designated as joint managing conservator); *J.A.S. v. A.R.D.*, No. 02-17-00403-CV, 2019 WL 238118, at *2–3 (Tex. App.—Fort Worth Jan. 17, 2019, no pet.) (mem. op.) (same); *In re A.D.*, 474 S.W.3d 715, 718–19, 730–31 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (same); *In re K.N.C.*, 276 S.W.3d 624, 626, 628 (Tex. App.—Dallas 2008, no pet.) (same).

As noted above, Texas courts have recognized numerous factors that may be considered when determining the best interest of the child. *See, e.g.*, *Holley*, 544 S.W.2d at 371–72 (listing factors). Also, when a child is less than three years old, the trial court must render an order "appropriate under the circumstances" for possession of the child. *See* TEX. FAM. CODE ANN. § 153.254(a); *see also id.*

§ 153.251; *In re C.B.M.*, 14 S.W.3d at 858 ("Statutory guidelines for possession of a child by a parent named as a possessory conservator are intended to guide the courts in ordering the terms and conditions for . . . the minimum possession for a joint managing conservator."). In doing so, the trial court may consider all relevant factors, including: (1) the caregiving provided to the child before and during the current suit; (2) the effect on the child that may result from separation from either party; (3) the availability of the parties as caregivers and the willingness of the parties to personally care for the child; (4) the physical, medical, behavioral, and developmental needs of the child; (5) the physical, medical, emotional, economic, and social conditions of the parties; (6) the impact and influence of individuals, other than the parties, who will be present during periods of possession; (7) the presence of siblings during periods of possession; (8) the child's need to develop healthy attachments to both parents; (9) the child's need for continuity of routine; (10) the location and proximity of the residences of the parties; (11) the need for a temporary possession schedule that incrementally shifts to the schedule provided in the prospective order under section 153.254(d) based on the child's age or minimal or inconsistent contact with the child by a party; (12) the ability of the parties to share in the responsibilities, rights, and duties of parenting; and (13) any other evidence of the best interest of the child. *See* TEX. FAM. CODE ANN. § 153.254(a); *Payandeh*, 2019 WL 2528197, at *7 (considering section 153.254 factors when determining

what type of possession to allow joint managing conservator); *see also* TEX. FAM. CODE ANN. § 153.251; *In re C.B.M.*, 14 S.W.3d at 858 ("Statutory guidelines for possession of a child by a parent named as a possessory conservator are intended to guide the courts in ordering the terms and conditions for . . . the minimum possession for a joint managing conservator.").

The evidence detailed above supporting the trial court's decision to grant Alejandro the exclusive right to designate A.E.M.'s primary residence and make educational decisions for A.E.M. also supports the trial court's implied decision that it would be in A.E.M.'s best interest for Elizabeth to have supervised visitation with A.E.M. *See Payandeh*, 2019 WL 2528197, at *7; *see also In re P.A.C.*, 498 S.W.3d at 219–20 (trial court did not abuse its discretion in fashioning restrictions on parent's possession and access when record contained evidence to support finding that such restrictions were in best interest of child).

Having reviewed the evidence in this case under the appropriate standards, we conclude that the record contains sufficient evidence for the trial court to have exercised its discretion to require Elizabeth's visitation with A.E.M. to be supervised. *See In re P.A.C.*, 498 S.W.3d at 219 (supervised visitation "in a joint managing conservatorship . . . may be appropriate when dictated by the circumstances"). Thus, we hold that the trial court did not err in ordering Elizabeth's visitation with A.E.M. to be supervised.

We overrule the remaining portion of Elizabeth's second issue.

## Admission of Testimony

In her third issue, Elizabeth argues that the trial court erred in admitting into evidence the testimony of four witnesses—CPS caseworker Smiley and Officers Welch, Correa, and Rivera—because the witnesses had not been disclosed to her in discovery before trial and their testimony did not shed light on the best interest of A.E.M.

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Villanova v. Fed. Deposit Ins. Corp.*, 511 S.W.3d 88, 94 (Tex. App.—El Paso 2014, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to any guiding rules and principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). To show the trial court abused its discretion, an appellant must demonstrate that: (1) the trial court erred in admitting the evidence; (2) the evidence was controlling on a material issue dispositive of the case and not cumulative; and (3) the error probably caused rendition of an improper judgment in the case. *Jones v. Pesak Bros. Constr., Inc.*, 416 S.W.3d 618, 632 (Tex. App.—Houston [1st Dist.] 2013, no pet.). If there is any legitimate basis for a trial court's evidentiary ruling, the appellate court must uphold it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

During discovery, a party may request disclosure of the name, address, and telephone number of any person with knowledge of relevant facts, along with a brief statement of each identified person's connection with the case. *See* TEX. R. CIV. P. 194.2(e); *Dyer v. Cotton*, 333 S.W.3d 703, 717 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Parties have a duty to amend or supplement incomplete or incorrect responses to written discovery. *See* TEX. R. CIV. P. 193.5(a); *Dyer*, 333 S.W.3d at 717. If a party fails to timely make, amend, or supplement a discovery response, that party may not offer the testimony of a witness who was not timely identified unless the trial court finds that (1) good cause exists for the failure to timely make, amend, or supplement the response, or (2) the failure will not unfairly surprise or prejudice the other party. *See* TEX. R. CIV. P. 193.6(a); *Dyer*, 333 S.W.3d at 717. The party seeking to call the witness bears the burden of establishing good cause or the lack of unfair surprise or prejudice. *See* TEX. R. CIV. P. 193.6(b); *Dyer*, 333 S.W.3d at 717. The trial court has broad discretion to determine whether the party has met this burden, but the trial court's determination must be supported by the record. *See* TEX. R. CIV. P. 193.6(b); *Dyer*, 333 S.W.3d at 717; *see also Syrian Am. Oil Corp., S.A. v. Pecten Orient Co.*, 524 S.W.3d 350, 366 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Rhey v. Redic*, 408 S.W.3d 440, 459 (Tex. App.—El Paso 2013, no pet.) (abuse-of-discretion standard applies to trial court's determination that

party was not unfairly surprised or prejudiced by admission of untimely disclosed evidence).

Elizabeth served Alejandro with a request for disclosure under Texas Rule of Civil Procedure 194. *See* TEX. R. CIV. P. 194.1. It is undisputed that Alejandro did not identify Smiley and Officers Welch, Correa, and Rivera in his response[11] to Elizabeth's request to disclose the name, address, and telephone numbers of persons having knowledge of relevant facts, along with a brief statement of each identified person's connection with the case. *See id.* 194.2(e). It is also undisputed that before trial Alejandro did not supplement his response to Elizabeth's request for disclosure to identify Smiley, Welch, Correa, and Rivera. *See id.* 193.5(a). The trial court, however, found that Elizabeth was not unfairly surprised or prejudiced by Alejandro's failure to disclose the identities of Smiley and the officers[12] and that the best interest of the child required that those witnesses be allowed to testify at trial.

The Texas Legislature has mandated that "[t]he best interest of [a] child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to [a] child." TEX. FAM. CODE ANN. § 153.002; *Taylor v. Taylor*, 254 S.W.3d 527, 534–35 (Tex. App.—Houston [1st

---

[11]    The trial court admitted into evidence a copy of Alejandro's response to Elizabeth's request for disclosure.

[12]    *See Brunelle v. TXVT Ltd. P'ship*, 198 S.W.3d 476, 479–80 (Tex. App.—Dallas 2006, no pet.) (holding party not unfairly surprised or prejudiced by failure to disclose when opposing party knew witness could have been potential witness).

43

Dist.] 2008, no pet.). And Texas courts have recognized that regard for the best interest of the child properly may be a factor influencing a trial court's ruling on a procedural issue. *See Taylor*, 254 S.W.3d at 534–35; *see also In re C.H.*, No. 07-04-0428-CV, 2006 WL 3813751, at *2–3 (Tex. App.—Amarillo Dec. 28, 2006, no pet.) (mem. op.) (affirming, in conservatorship case, trial court's ruling allowing late-disclosed witness to testify based on best interest of child); *C__ v. C__*, 534 S.W.2d 359, 361 (Tex. App.—Dallas 1976, writ dism'd w.o.j.) ("[T]he court's duty to protect the children's interests should not be limited by technical rules.").

As we have previously stated: "[T]he best interest of a child can only be attained when a court's decision is as well-informed as the circumstances allow. . . . [T]he exclusion of any important evidence . . . can only produce a less-informed decision, contrary to the best interest of the child." *Taylor*, 254 S.W.3d at 534 (quoting *In re P.M.B.*, 2 S.W.3d 618, 624–25 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also Young v. Young*, No. 03-14-00720-CV, 2016 WL 7339117, at *4 (Tex. App.—Austin Dec. 15, 2016, no pet.) (mem. op.) (in child-custody case, recognizing "with regard to the best interest of the child, [i]t is in the court's primary interest to have as much evidence before it as possible." (alteration in original) (internal quotations omitted)).

Here, the trial court could have admitted the testimony of Smiley and Officers Welch, Correa, and Rivera because the best interest of A.E.M. was at stake.[13] *See, e.g., R.H. v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-00-00018-CV, 2001 WL 491119, at *8 (Tex. App.—Austin May 10, 2001, pet. denied) (not designated for publication); *C__*, 534 S.W.2d at 361 ("Pertinent facts which may directly affect the interests of the child[] should be heard and considered by the trial court regardless of the lack of diligence of the parties in their presentation of information to the court."); *see also Spurck v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 215 (Tex. App.—Austin 2013, no pet.); *Chavez v. Chavez*, 148 S.W.3d 449, 459 n.7 (Tex. App.—El Paso 2004, no pet.) (technical rules of practice "have frequently been abandoned in child custody proceedings"). Thus, we hold that the trial court did not err in admitting into evidence the testimony of Smiley, Welch, Correa, and Rivera.

We overrule Elizabeth's third issue.

---

[13] Although Elizabeth asserts in her brief that the testimony of Smiley and Officers Welch, Correa, and Rivera did not shed light on the best interest of A.E.M., we disagree. As noted above, their testimony was relevant to, but not limited to, the emotional and physical danger to A.E.M. now and in the future, parental abilities, stability of the parents' home, and the acts or omissions of the parents. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Justices Keyes, Hightower, and Countiss.